UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X

United States of America,

                                    09-CR-369
                      Plaintiff,    (CPS)

        - against -

                                    MEMORANDUM
                                    OPINION AND
Jose Rios                           ORDER

                      Defendant.

-------------------------------------------X

SIFTON, Senior Judge.

On June 4, 2009, defendant Jose Rios was indicted for
possession of a firearm after having previously been convicted of
a felony,[1] in violation of 18 U.S.C. § 922(g)(1).  He is
currently detained pending trial.  Presently before this Court is
defendant's motion to suppress certain statements and physical
evidence pursuant to Rule 12 of the Federal Rules of Criminal
Procedure, which was the subject of a hearing held before the
undersigned on July 27, 2009.  For the reasons set forth below,
defendant's motion is denied.  What follows sets forth the
findings of fact and conclusions of law on which this
determination is based.

## BACKGROUND

The following facts are drawn from the testimony presented

---

[1] According to the criminal complaint filed in connection with this
matter, defendant has previously been convicted of at least six felonies,
including aggravated criminal contempt, second-degree assault, attempted
burglary, and criminal possession of a controlled substance.  Compl. ¶ 5.

by the government at the July 27, 2009 hearing and the affidavit
submitted by defendant, who did not testify at the hearing.
Disputes are noted.

On May 2, 2009, the 73rd Precinct's Conditions Team,[2]
consisting of Police Officers Anthony D'Esposito, Joseph Weldon,
Arthur Umlauf, and Sergeant John Portalatin, was assigned to the
housing developments in the vicinity of Pitkin Avenue and Junius
Street, where there had been a recent spike in robberies.
Transcript of July 27, 2009 Hearing ("Tr.") 9-10, 59, 76.
Sergeant Portalatin and Officer Umlauf were on bicycle patrol in
uniform inside the housing developments, where vehicle access is
limited. Tr. 9, 10-12, 59, 75. Officers D'Esposito and Weldon
were in uniform in a marked radio motor patrol vehicle parked
outside of the housing developments, where they could assist
Sergeant Portalatin and Officer Umlauf should any individuals
addressed inside the housing developments flee onto the street.
Tr. 10-12. Officers D'Esposito and Weldon maintained
communication with Sergeant Portalatin and Officer Umlauf via
radio. Tr. 10.

Officer D'Esposito testified that on May 2, 2009, at
approximately 12:45 p.m., while the patrol car was parked on the

---

[2] The 73rd Precinct's Conditions Team is charged with addressing spikes
in criminal activity within the various housing developments located in the
precinct, as well as quality of life issues within the precinct, including the
riding of bicycles on sidewalks, open containers in public, and urinating in
public. Tr. 7-8.

corner of Van Sinderen Avenue and Pitkin Avenue, he observed two
men on bicycles "come down the handicapped cutout on the corner
of Pitkin and VanSinderen, cross in front of the marked [patrol
car] and then reenter the sidewalk on the other side of the
street on the same corner, where they proceeded westbound on
Pitkin Avenue" down a small hill. Tr. 13, 41. He noted that it
was a clear afternoon and that there was nothing obstructing his
view at the time. Tr. 13-14. He further testified that, when he
first observed the two men on bicycles, they were approximately
one car-length away from the patrol car, and that there were no
signs in the area authorizing individuals to ride bicycles on the
sidewalk. Tr. 13, 16. One of the men was later identified as
defendant. Tr. 22. According to defendant, on May 2, 2009, he
was obeying all traffic laws when riding the bicycle and was not
riding on the sidewalk. Declaration of Jose Rios ("Rios Decl.")
¶ 3.

Upon observing the men on bicycles, Officer D'Esposito
radioed Officer Umlauf to inform him that he and Officer Weldon
were about to stop the two men to issue them a summons for riding
bicycles on the sidewalk. Tr. 14-15, 60, 76. Officer Weldon,
who was driving the patrol car, made a right turn onto Pitkin
Avenue from Van Sinderen Avenue, heading westbound, in the same
direction as the two men on bicycles. Tr. 15. According to
Officer D'Esposito, the two men were to the right of the patrol

car, about half a car-length in front, riding their bicycles on
the sidewalk.  Tr. 15.  Once the patrol car was about ten feet
away from the corner of Pitkin Avenue and Junius Street, Officer
Weldon gave a beep of the siren, and Officer D'Esposito asked the
two men to stop so that they could speak to them.  *Id.*  Officer
D'Esposito testified that the time that elapsed between the two
men's passage in front of the patrol car and their arrival at the
scene of the stop was a "few seconds."  Tr. 45.  At approximately
the same time Officers D'Esposito and Weldon pulled over at the
scene of the stop, Sergeant Portalatin and Officer Umlauf arrived
at the scene on bicycles.  Tr. 21-22, 60, 76-77, 80.  Officer
Umlauf testified that it took him no more than ten to 15 seconds
to arrive on the scene after receiving Officer D'Esposito's radio
transmission, and Sergeant Portalatin testified that it took "a
few seconds" but could not recall the precise amount of time.
Tr. 63, 80.

Officers D'Esposito and Weldon then exited the patrol car
and approached the two men in order to issue them a summons for
violating the provision of the New York City Administrative Code
generally prohibiting the riding of bicycles on sidewalks.[3]  Tr.
16-17.  Officer D'Esposito testified that, after exiting the
patrol car, he approached the defendant, Jose Rios, while Officer

---

[3] New York City Administrative Code Section 19-176 provides, in relevant
part, that "[n]o person shall ride a bicycle upon any sidewalk unless
permitted by an official sign."

Weldon approached the other man.  Tr. 21-22.  Sergeant Portalatin
and Officer Umlauf saw Officer D'Esposito approach the defendant,
and Officer Umlauf testified that when he arrived at the scene,
the defendant was "straddling [his] bicycle."  Tr. 61, 77, 80.
Sergeant Portalatin could not recall whether the defendant was on
his bicycle when he arrived at the scene.  Tr. 64.  Officer
D'Esposito noted that when he stopped the defendant, the
defendant was wearing glasses, a gray hooded sweatshirt which hit
"right around his waistband" and jeans that "were not tight but
not extremely baggy either."  Tr. 23; *see also* Gov't Ex. 3 (copy
of photo of defendant taken at the precinct following defendant's
arrest).

Officer D'Esposito testified that when he first approached
the defendant, he asked the defendant, who was seated on his
bicycle, facing him, to step off of his bicycle for safety
reasons.  Tr. 21, 25, 27.  The defendant complied, stepping off
of the bicycle with his left foot first.[4]  Tr. 25-26.  As he
swung his "right foot and right leg behind himself to remove
himself from the bicycle, it tightened up his jeans," and Officer
D'Esposito observed the "L-shape" outline of a gun "pointing down
towards his leg" in the defendant's left front pants pocket.  Tr.
25-27, 36.  At the Court's request, Officer D'Esposito

---

[4] Both Officer Umlauf and Sergeant Portalatin testified that they never
actually saw the defendant get off his bicycle.  Tr. 64, 81.

demonstrated how the defendant dismounted from his bicycle and how he was subsequently able to observe the outline of the gun in the defendant's left front pants pocket.  Tr. 26-27.  Officer D'Esposito acknowledged that he could not determine whether the gun was a revolver or a pistol and that he could not make out the trigger, but also testified that he was able to determine that the item was a gun, and not a wallet, cellular phone or i-Pod, because of its L-shape.  Tr. 28, 47-48.

Officer D'Esposito then stated to the other officers, "We may have a possible 265.03,"[5] which Officer D'Esposito described as the "code word for us to let the officers on the scene know that we do have a possible firearm . . . [to raise] their awareness . . . that there may a loaded gun on scene."  Tr. 28-29.[6]  Sergeant Portalatin and Officer Umlauf recalled Officer D'Esposito's "265.03" reference and testified that in response,

_____

[5] New York Penal Law § 265.03 is the New York statutory provision that applies to criminal possession of a weapon in the second degree, a class C felony.

[6] At a parole hearing on June 10, 2009, Officer D'Esposito testified to a different sequence of events.  While he testified at the July 27, 2009 suppression hearing that he stated "we may have a 265.03" upon observing the outline of a gun and prior to patting down the defendant and questioning him, at the parole hearing, he testified to the following sequence of events:

> I grabbed him by his belt buckle and frisked the area where I saw the outline of a firearm.  It felt like a firearm.  I asked him if he had anything on him that he was not supposed to have.  He made a statement saying it's not loaded, it's only a misdemeanor.  At that moment I made a verbal statement to my team saying that we may have a 265.03, which is the penal code for a firearm.

Def. Ex. D (copy of parole hearing transcript) at 10; *see also* Tr. 52. At the July 27, 2009 suppression hearing, Officer D'Esposito characterized the discrepancy in his testimony as "a mistake I made that day."  Tr. 52.

they moved closer to Officer D'Esposito and the defendant. Tr. 29, 61, 78. Sergeant Portalatin positioned himself immediately behind the defendant. Tr. 61-62.

Officer D'Esposito testified that he stepped in front of the defendant, took hold of the defendant's belt buckle, and asked the defendant if he had anything on his person that he was not supposed to have. Tr. 29-30. When asked why he asked the defendant that question, Officer D'Esposito testified as follows:

> [I]t is just a practice that we have basically for our safety. You know, it's – sometimes – at some point it defuses a situation. If you give the person the opportunity to state what they have on them. It could eliminate wrestling with them on the ground or fighting with them, or worst case scenario, someone getting hurt.

Tr. 30. When asked why he took hold of the defendant's belt buckle, Officer D'Esposito testified as follows:

> A:  I took hold of the defendant's belt buckle again for the safety of myself and the safety of my team members. It's a practice that we use. It eliminates the chance or reduces the chance of the person that we are engaging with to either, one, reach for the firearm or, two, try to flee the scene.
> Q:  Is that how you typically secure a person, whom you suspect might be in possession of a weapon?
> A:  Yes. That's how I typically stop someone.
> Q:  Why is that?
> A:  It is just what I was taught and in past practices, from our arrests, it seems to always prevent the person from running and it also gives us the opportunity to have a full view of the person that you are interacting with from head to toe. You could see any sudden movements that they are making from their feet, their hands, and it makes us feel more comfortable.

Tr. 31.

In response to Officer D'Esposito's question, the defendant responded, "It's not loaded. It's only a misdemeanor." Tr. 30. Officer Umlauf recalled Officer D'Esposito's question and the defendant's answer, and Sergeant Portalatin heard the defendant "utter a statement" although he "couldn't make out the words." Tr. 61-62; 77-78. At the time the defendant made the statement, Officers D'Esposito and Umlauf and Sergeant Portalatin testified that the defendant was not handcuffed, that none of the officers had their weapons drawn, and that none of the officers were yelling or screaming at the defendant. Tr. 31, 62, 79-80.

Officer D'Esposito testified that, with his right hand, he then patted the defendant's left front pants pocket, where he had observed what he believed was the outline of a gun, and felt what appeared to be a gun. Tr. 32-33. Sergeant Portalatin, who was standing directly behind the defendant, then reached into the defendant's left front pants pocket and recovered an unloaded, defaced .25 caliber Raven Arms semiautomatic pistol. Tr. 33-34, 62. Officer Umlauf observed these actions from approximately one foot away and then handcuffed the defendant. Tr. 78-79, 82-83. The defendant was then arrested, placed in a police vehicle, and transported back to the 73rd Precinct. Tr. 37, 68, 83-84. The defendant's cycling companion was also transported back to the 73rd Precinct, where he was issued a summons. Tr. 37-38.

Officers D'Esposito and Umlauf and Sergeant Portalatin testified that the entire incident, from the stop of defendant to his arrest, lasted about five to seven minutes. Tr. 38, 66, 83.

## DISCUSSION

Defendant argues that the gun recovered from him was obtained in violation of his rights secured by the Fourth Amendment.[7] He further argues that his statement prior to his arrest was obtained in violation his rights under the Fourth Amendment as well as his rights under the Fifth Amendment,[8] as described in *Miranda v. Arizona*, 384 U.S. 436 (1966). Accordingly, he argues that both the gun and the statement must be suppressed as the fruits of an illegal search and seizure. *See generally Wong Sun v. U.S.,* 371 U.S. 471, 484-86 (1963).

I. <u>**Whether the Gun Must Be Suppressed**</u>

Defendant offers two reasons why the officers' recovery of his firearm was unlawful. First, he argues that when the officers stopped him, they illegally "seized" his person in violation of the Fourth Amendment. Second, he argues that there was no lawful basis for searching his pockets, and therefore, that the gun obtained as a result of the illegal search must be

---

[7] The Fourth Amendment to the United States Constitution provides, in relevant part: "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . . but upon probable cause[.]"

[8] The Fifth Amendment to the United States Constitution provides, in relevant part: "[N]or shall any person . . . be compelled in any criminal case to be a witness against himself[.]"

suppressed.

**A.** ***Whether the Police Officers' Stop of Defendant Was Lawful***

When a police officer briefly detains an individual for questioning, the stop is considered a "seizure" within the meaning of the Fourth Amendment. *See U.S. v. Muhammad*, 463 F.3d 115 (2d Cir. 2006). Under *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, a police officer's brief detention of an individual for questioning does not violate the Fourth Amendment if the officer has "reasonable suspicion to believe that criminal activity has occurred or is about to occur." *U.S. v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995) (citation and quotation marks omitted). Reasonable suspicion, like probable cause, is determined based upon the totality of the circumstances, but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *U.S. v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007) (quoting *U.S. v. Arvizu*, 534 U.S. 266, 273-74 (2002)) (internal quotation marks omitted). The circumstances surrounding the stop are evaluated "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *U.S. v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008) (quoting *U.S. v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000)) (internal quotation marks omitted).

- 11 -

The government argues that Officer D'Esposito had reasonable suspicion to believe that the defendant had committed a traffic infraction, in violation of New York City Administrative Code Section 19-176, when he observed the defendant riding his bicycle on a sidewalk. *See U.S. v. McFadden*, 238 F.3d 198, 203-04 (2d Cir. 2001) (holding that police officers are permitted not only to stop, but also to arrest individuals whom they observe violating Section 19-176 of the New York City Administrative Code). According to the defendant, however, he was "obeying all traffic laws when riding [his] bike, and was not riding on the sidewalk[.]" Rios Decl. ¶ 3. Whether reasonable suspicion justified Officer D'Esposito's stop of defendant turns on the resolution of this factual dispute.

Having considered the totality of the evidence presented at the July 27, 2009 hearing, I credit Officer D'Esposito's testimony that he observed the defendant riding his bicycle on the sidewalk. Officer D'Esposito testified credibly and in great detail about the particulars of his encounter with the defendant, including when, where and for how long he observed the defendant and his companion riding their bicycles on the sidewalk, how far away they were from the police vehicle, what the lighting conditions were like, and whether there was anything obstructing his view. Officer D'Esposito's testimony was corroborated by Officer Umlauf's testimony that, at approximately 12:45 p.m. on

May 2, 2009, he received a radio transmission from Officer D'Esposito that Officers D'Esposito and Weldon intended to effect a stop of two individuals for riding their bicycles on the sidewalk. Sergeant Portalatin, who was with Officer Umlauf when he received Officer D'Esposito's radio transmission, also confirmed this account. Accordingly, Officer D'Esposito had reasonable suspicion to stop the defendant for a violation of Section 19-176.

**B.    *Whether the Police Officers' Patdown of Defendant Was Lawful***

Defendant further argues that even if the stop was lawful, the police had no basis upon which to search his person. Like the occupant or driver of a car subjected to a traffic stop, a person on a bicycle stopped for a traffic infraction may only be searched if the police have a reasonable suspicion that the person is armed and dangerous. *See U.S. v. Muhammad*, 463 F.3d 115, 123-24 (2d Cir. 2006); *see generally Arizona v. Johnson*, 129 S.Ct. 781, 786 (2009). Nevertheless, "[w]here an officer makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Muhammad*, 463 F.3d 115, 123-24 (2d Cir. 2006) (quoting *Terry v. Ohio*, 392 U.S. 1, 30

(1968)) (internal quotation marks omitted).

The government argues that the officers reasonably feared
for their safety because when Officer D'Esposito asked the
defendant to step off of his bicycle, he observed the outline of
a gun in the defendant's left front pants pocket.  Were this
true, the defendant concedes that his subsequent patdown search
would be justified.  Defendant maintains, however, that "it was
impossible to see the gun through [his] clothes."  Rios Decl. ¶
4.

Considering the totality of the evidence presented at the
July 27, 2009 hearing, I find that Officer D'Esposito observed
the outline of a gun in defendant's left front pants pocket.
Officer D'Esposito testified in detail, and demonstrated for the
Court, how he was able to observe the outline of a gun in the
defendant's left front pants pocket as the defendant swung his
right foot over the bicycle frame to dismount.  Officer
D'Esposito described what the defendant was wearing at the time
of the stop, how his clothing shifted throughout his dismount
from the bicycle, and how the gun was situated in the defendant's
pocket.  Officer D'Esposito's testimony regarding his observation
of the outline of the gun in the defendant's pocket was
corroborated by both Officer Umlauf and Sergeant Portalatin.
Officer Umlauf testified that he heard Officer D'Esposito advise
that there was a "possible 265," the code used by the officers to

signify the possible presence of a firearm.  Sergeant Portalatin
likewise testified that, shortly after arriving at the scene, he
heard Officer D'Esposito say "he might possibly have a 265.03" in
reference to the defendant.  Taken together, the officers'
testimony persuades me that Officer D'Esposito observed a gun in
the defendant's pocket, and thus that he was reasonably
suspicious that the defendant was armed and dangerous.

    Defendant offers several reasons why I should not credit the
officers' testimony.  First, he argues that the alleged timing of
Officer D'Esposito's radio transmission to Officer Umlauf, and
Officer Umlauf and Sergeant Portolatin's subsequent arrival on
the scene of the stop, was so rapid that it "defies reason."  I
disagree.  While the officers' testimony reveals that events
indeed proceeded quickly -- the radio transmission was made a few
seconds before Officer D'Esposito asked defendant and his cycling
companion to stop, and Officer Umlauf and Sergeant Portolatin
arrived on the scene on bicycles ten to 15 seconds after the
radio transmission, all while defendant was cycling downhill --
the timing of this sequence of events is by no means impossible
or even highly improbable.  I find that it does not render the
officers' otherwise credible testimony suspect.

    Next, defendant argues that Officer D'Esposito's testimony
that the gun was visible through the defendant's pants pocket is
incredible on its face, apparently because Officer D'Esposito did

not explain how he knew the L-shape he saw was a firearm, not a combination of two innocuous objects. This argument is unpersuasive. Officer D'Esposito's professional experience afforded him an ample basis to identify the L-shaped item in the defendant's pocket as a firearm, even if he could not be certain whether the gun was a revolver or a pistol, and even if he could not make out the trigger. While Officer D'Esposito testified that he "guess[ed]" it was "possible" that a wallet and a cell phone could combine into an L-shape, Tr. 49, his identification of the L-shape as a gun was reasonable, as was his suspicion that the defendant was armed and dangerous.

Defendant also makes much of the discrepancy between Officer D'Esposito's testimony at the parole hearing on June 10, 2009, and his testimony at the July 27, 2009 suppression hearing. At the parole hearing, Officer D'Esposito testified that he stated to his team, "we may have a 265.03," after frisking the defendant and after the defendant said, "it's not loaded, it's only a misdemeanor." The defendant concedes that Officer D'Esposito's testimony at the suppression hearing -- that he alerted his team as soon as he saw the gun and before frisking the defendant -- is more plausible, but argues that the inconsistency is "the sort of mistake one makes when trying to recount an event that did not happen." Def. Post-Hr'g Br. at 3. Officer D'Esposito testified, however, that his statement at the parole hearing was simply "a

mistake [he] made that day." Tr. 52.  Given the rapidity of the events to which Officer D'Esposito and the other officers testified, I find that a mistake made in recounting the sequence of those events is entirely plausible, and it does not persuade me that the officers' testimony should be discredited.

Finally, defendant argues that the testimony of Officers Umlauf and Sergeant Portalatin is insufficient to corroborate Officer D'Esposito's testimony.  Specifically, he points to the fact that Sergeant Portalatin could not recall whether the defendant was still on his bicycle when he arrived at the scene, and that neither Officer Umlauf nor Sergeant Portalatin actually saw the defendant dismount from his bicycle, nor did they observe the outline of the gun when the defendant's pants tightened during the dismount.  These facts are, however, consistent with the officers' account of events.  When Officer Umlauf and Sergeant Portalatin arrived on the scene, they were confronted not only with Officer D'Esposito and the defendant, but also with Officer Weldon and the defendant's cycling companion.  It makes sense that the attention of Officer Umlauf and Sergeant Portalatin would be divided upon their arrival, and it is entirely credible that neither officer recalls observing the defendant dismount from his bicycle or seeing the outline of the gun as he did so.  That Officer Umlauf and Sergeant Portalatin cannot directly corroborate the visible outline of the gun does

not render their testimony worthless, as it supports and confirms other aspects of Officer D'Esposito's testimony.

In any event, even if I were to find that Officer D'Esposito did not observe the outline of a gun in the defendant's pants pocket, the government's second argument also persuades me that the patdown search of defendant did not violate his Fourth Amendment rights. Whether or not Officer D'Esposito actually saw the outline of the gun, there is no dispute that he asked defendant if he had anything on his person that he was not supposed to have. Defendant responded, "It's not loaded. It's just a misdemeanor." Defendant does not deny having made this statement. Upon hearing this statement, a reasonable police officer would conclude that defendant was armed, thereby posing a potential threat to the officer's safety and the safety of others at the scene. Under these circumstances, it is well settled that a "patdown is reasonable to allow the officer to pursue his investigation without fear of violence." *See Muhammad*, 463 F.3d at 124 (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)) (internal quotation marks omitted). Accordingly, the gun will not be suppressed.

## II.  Whether Defendant's Pre-Arrest Statement Must Be Suppressed

Defendant first contends that his pre-arrest statement -- namely, "It's not loaded.  It's just a misdemeanor" -- must be suppressed because it was obtained as the result of a seizure of

his person in violation of his Fourth Amendment rights. As
discussed above, because I find that Officer D'Esposito had
reasonable suspicion to stop the defendant for a violation of
Section 19-176, there was no Fourth Amendment violation, and the
defendant's statement will not be suppressed on this ground.

Defendant further contends that his statement must be
suppressed because it was obtained in violation of his Fifth
Amendment right to freedom from self-incrimination. In support
of this claim, defendant argues that he was subjected to
custodial interrogation when Officer D'Esposito, after asking the
defendant to step off of his bicycle, asked him if he had
anything on his person that he was not supposed to have. It is
well established that a person subjected to custodial
interrogation must be provided with the now-familiar *Miranda*
warnings as to his rights prior to any such questioning. *Miranda
v. Arizona*, 384 U.S. 436 (1966).

I need not determine whether the defendant was subjected to
custodial interrogation, however, because Officer D'Esposito's
question falls within the "public safety" exception to the
*Miranda* rule. This exception authorizes pre-*Miranda* warning
questioning that is justified by an "objectively reasonable need
to protect the police or the public from any immediate danger."
*U.S. v. Newton*, 369 F.3d 659, 677-78 (2d Cir. 2004) (quoting *N.Y.
v. Quarles*, 467 U.S. 649, 659 n.8 (1984)); *see also U.S. v.*

*Reyes*, 353 F.3d 148, 155 (2d Cir. 2003); *U.S. v. Zubiate*, No. 08-
CR-507, 2009 WL 483199, at *6-7 (E.D.N.Y. Feb 25, 2009).

The Second Circuit's "cases addressing the public safety
exception distill to three principles." *U.S. v. Estrada*, 430
F.3d 606, 612 (2d Cir. 2005). First, "'*Miranda* warnings need not
precede questions reasonably prompted by a concern for the public
safety, or for the safety of the arresting officers,' . . . 'so
long as the questioning relate[s] to an *objectively* reasonable
need to protect the police or the public from any immediate
danger.'" *Id.* (quoting *U.S. v. Reyes*, 353 F.3d 148, 152 (2d Cir.
2003) (internal quotation marks omitted) and *U.S. v. Newton*, 369
F.3d 659, 677 (2d Cir. 2004) (internal quotation marks omitted)
(alteration and emphasis in original)). "Like the reasonableness
standard itself, the public safety exception is 'a function of
the facts of cases so various that no template is likely to
produce sounder results than examining the totality of the
circumstances in a given case.'" *Reyes*, 353 F.3d at 152 (quoting
*U.S. v. Banks*, 540 U.S. 31, 36 (2003)). Second, although "framed
spontaneously in dangerous situations," *Newton*, 369 F.3d at 678,
pre-*Miranda* questions may not be investigatory or designed to
elicit testimonial evidence. *Estrada*, 430 F.3d at 612. The
Second Circuit has acknowledged, however, that "a question need
not be posed as narrowly as possible, because 'precision crafting
cannot be expected' in the circumstances of a tense and dangerous

arrest. Thus, a question that plainly encompasses safety
concerns, but is broad enough to elicit other information, does
not necessarily prevent application of the public safety
exception when safety is at issue and context makes clear that
the question primarily involves safety." *Id.* (citing *Newton*, 369
F.3d at 678-79). Third, pre-*Miranda* questioning of suspects as a
routine matter is expressly prohibited. *Id.*

Here, after Officer D'Esposito observed the outline of what
he believed to be a gun in the defendant's pocket, he had ample
reason to fear for his and the other officers' safety and an
"objectively reasonable need" to protect himself from immediate
danger. Given this context, I find that the question posed by
Officer D'Esposito to the defendant -- whether he had anything on
his person that he was not supposed to have -- was reasonably
"aimed at controlling a potentially dangerous situation and
relieving an immediate threat to the officers' safety." *Estrada*,
430 F.3d at 613. While Officer D'Esposito's question was broad
enough that it could have elicited information irrelevant to the
officers' safety, "precision crafting" is not required under such
circumstances, and it is clear to me that Officer D'Esposito's
question was primarily motivated by safety concerns.
Accordingly, Officer D'Esposito's question falls within the
public safety exception to the *Miranda* doctrine, and defendant's

pre-arrest statement will not be suppressed on Fifth Amendment grounds.

## CONCLUSION

For the reasons set forth above, defendant's motion is denied.  The Clerk is directed to transmit a filed copy of the within to the parties.


SO ORDERED.

Dated:     Brooklyn, New York
           August 24, 2009

                    By: <u>/s/ Charles P. Sifton (electronically signed)</u>
                         United States District Judge